**ATLAS ENTERPRISES LIMITED PARTNERSHIP, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 94–10L.

United States Court of Federal Claims.

Feb. 14, 1995.

Harold Gordon, Washington, DC, for plaintiff.

Alan Brenner, U.S. Dept. of Justice, Washington, DC, for defendant.

### OPINION AND ORDER

HODGES, Judge.

Plaintiff seeks just compensation for the alleged wrongful taking of its property in violation of the Fifth Amendment of the Constitution of the United States. This Court has jurisdiction under 28 U.S.C. § 1491. Defendant filed a motion for summary judgment. As genuine issues of material fact are involved, we must deny defendant's motion.

### FACTS

This action centers on legislation impacting the development of the 800 block of F Street,

N.W., Washington, D.C., otherwise known as Square 406. Approximately 40% of Square 406 is occupied by five buildings located on the north end of the block fronting F Street. The Atlas Building stands on the northwest corner of the block, the Le Droit Building on the northeast corner. The two larger corner buildings are separated by three smaller buildings. These are the only buildings on Square 406. The remaining 60% of Square 406, which is unimproved and contiguous, is a surface parking lot. Plaintiff owns the Atlas Building, the Le Droit Building, and 818 F Street, one of the smaller buildings located between the Atlas and Le Droit buildings. The remaining two buildings between the Atlas and Le Droit buildings are owned by the Pennsylvania Avenue Development Corporation (PADC).[1] The unimproved portion of the property is leased to Colonial Parking.

#### Pennsylvania Avenue Plan

Square 406 is subject to developmental limitations promulgated by PADC in the Pennsylvania Avenue Plan. The Secretary of the Interior designated parts of Pennsylvania Avenue as historic sites in 1965 pursuant to the Historic Site Act of 1935, 16 U.S.C. §§ 461–470w, 40 U.S.C. § 874(c). Square 406 is one of these areas.

PADC issued the Plan in 1974 setting forth a block by block description of existing conditions and PADC's proposals for development for each city square within its jurisdiction. The Plan also imposes limitations upon the development of the city squares in that area. Two of the limitations are (1) minimum development parcels, and (2) treatment of historic structures.

#### I. Minimum Development Parcels

The Plan designates parcels which may be developed only as a comprehensive whole. The 1980 Square Guidelines for Square 406 state that it is a minimum parcel. Thus, its development must be undertaken according to a comprehensive plan. To implement a comprehensive plan for development, Square 406 need not be owned by a single entity; the development plan may be carried out by

---

1. PADC was created in 1972 by Pub.L. No. 92–578, 40 U.S.C. §§ 871–885, to develop and implement a plan of development for the Pennsylvania Avenue area. PADC has jurisdiction over Square 406.

a joint venture representing all the property owners of Square 406.

Absent sole ownership or a joint venture among multiple owners, the Plan permits an owner to seek PADC's assistance with land assembly. PADC will secure the property by condemnation or other means and either sell the property to a developer or enter into a joint venture. To obtain land assembly assistance, PADC requires the developer "to have effective control of at least fifty percent of the real property within the development parcel(s) which he wishes to develop ... [and] to have made his best efforts to acquire all of the real property within the development parcel(s) he wishes to develop." Thus, to develop Square 406, plaintiff either must acquire all the property within the square, enter into a joint venture with the other owners of property within the square, or gain effective control of at least 50% of the Square.

## II. Treatment of Historic Structures

The second major restriction on development is PADC's requirement for the treatment of historic structures as described in the Plan and its supporting documents. The Plan states in the proposed development section for Square 406 that "[t]he *facades* of the landmark structure along the 800 block of F Street would be retained and incorporated into the new development." [Emphasis added.] This language is supported by the accompanying illustrations and the Illustrative Site Plan. These illustrations show new buildings overlapping the Atlas Building and the building at 818 F Street. The Le Droit Building appears to be retained in place.

In contrast, the narrative for the Illustrative Site Plan states that "[a]ll designated landmark structures would be retained and, if necessary, rehabilitated." The illustration designates by means of a shaded legend all the landmark structures within the Plan's geographic area. All of the buildings within Square 406 are designated as landmark structures.

The 1980 Guidelines for Square 406 contain the regulatory system for approval of development projects, general criteria for development, and specific criteria for development for Square 406. Under the general

criteria section, the guidelines specify that "[n]ew development on Square 406 will also incorporate restoration in place of the landmark structures in the 800 block of F Street." Under the specific criteria section, the subsection on historic preservation states that "[t]he 800 block of F Street is a designated landmark and must be preserved in place."

The 1986 amendments to the Plan state that commercial buildings fronting F Street are Category III landmarks and listed on the National Register of Historic Places. Category III landmarks "would be preserved, or restored, *if practicable.*" [Emphasis added.] The proposed development for Square 406 indicates that "[t]he facades of the landmark structures along the 800 Block of F Street would be retained and incorporated into the new development."

The Historic Preservation Plan of PADC designates Square 406 as a Category II landmark. Category II landmarks "should be preserved or restored, *if possible.*" [Emphasis added.] The Preservation Plan discusses Square 406 in a section involving restoration in place and maintenance of landmark structures.

PADC's Board of Directors approved a September 1990 resolution requiring historic buildings on Square 406 be retained in their entirety and rehabilitated in place. The amendment changed the proposed development section to read, "[t]he five landmark buildings along the 800 block of F Street, which are listed individually on the National Register of Historic Places, would be designated for Group 1 historic preservation treatment and would be retained ... and incorporated into the new development."

Plaintiff purchased Lots 807, 809, 810, 811, and 814 of Square 406 for the purpose of developing the property for commercial and retail use on November 30, 1988. During the period between purchase in 1988 and the 1990 amendment, Atlas conducted negotiations with Mrs. Jan Evans, the owner of some portion of the southern part of Square 406. Atlas sought either to buy the property outright or to develop the square as a joint

venture. These negotiations were unsuccessful.

## DISCUSSION

 A grant of summary judgment is proper when no issues of material fact are in dispute and where, as a matter of law, the moving party is entitled to judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). A movant for summary judgment must show the absence of any genuine issue of material fact or, in the alternative, that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once a proper showing is made, the burden shifts to the adverse party to prove by sufficient evidence that a genuine issue of material fact is present for trial. *Id.* at 322, 106 S.Ct. at 2552. In considering the motion, the court must draw all justifiable inferences in the non-movant's favor, and any evidence which the non-movant presents is considered to be true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Genuine issues of fact would change the outcome of the litigation. *Id.* at 247–48, 106 S.Ct. at 2509–10.

 In claims alleging a regulatory taking of property, the Supreme Court has generally avoided the use of any set formula for the determination of whether a regulation has gone so far as to constitute a regulatory taking. *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Courts have found that the analysis of whether a governmental action is a regulatory taking usually involves an ad hoc, factual inquiry into the circumstances of each particular case. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893; *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 155 (1990), *aff'd*, 28 F.3d 1171 (Fed.Cir.1994). Courts find a regulatory taking has occurred where: (1) there was a denial of economically viable use of the property as a result of the regulatory imposition; (2) the property owner had distinct investment-backed expectations; and

(3) it was an interest vested in the owner as a matter of state property law, and not within the power of the state to regulate under the common law nuisance doctrine. *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994). The third issue is not reached in the pleadings.

### I. Denial of Economically Viable Use

Defendant argues that economically viable use of the property has not been denied by the adoption of the 1990 amendment because plaintiff's holdings are leased to retail tenants and these leases produce a gross annual rental income of $231,004. Plaintiff contends that the retail leases are not an economically viable use. According to plaintiff, the properties incur annual losses of approximately $800,000. The largest portion of these losses results from the annual debt service attributed to the properties. Defendant also argues that the 1990 amendment did not render the property valueless because after condemning the property, PADC deposited $9,050,000 as estimated compensation representing the fair market value of the property.

 Where a regulation categorically prohibits all economically beneficial use, the regulation has effected a taking. *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1564–65 (Fed.Cir.1994). If a regulation prohibits less than all economically viable benefit, the determination must be made of whether a noncompensable "mere diminution" or a compensable "partial taking" has occurred. *Florida Rock*, 18 F.3d at 1570. In this determination, the proper focus is on fair market value prior and subsequent to the regulatory imposition. *Florida Rock*, 18 F.3d at 1563. We lack sufficient facts to make this determination.

### II. Distinct Investment-backed Expectations

Plaintiff's distinct investment-backed expectations were the development of its Square 406 holdings. As stated in its pleadings, plaintiff never considered maintaining the properties in their current use and operation. The Government argues that plaintiff's investment-backed expectations for develop-

ment of the properties were precluded by the minimum development parcel designation in effect at the time of purchase rather than the 1990 amendment. It argues further that the regulatory scheme in place at the time of Atlas' purchase provided notice that full retention of the buildings could or would be required. Thus, plaintiff's investment-backed expectations were unreasonable in light of this actual or constructive knowledge. Both of these arguments raise issues of material fact.

### A. Minimum Development Parcel

The Government contends that even without the 1990 amendment, plaintiff could not have developed its property because it did not have the requisite ownership share or the cooperation of other owners necessary for development. It points out that plaintiff has not entered into an agreement with Mrs. Evans for the sale of her Square 406 holdings or for her participation in a joint venture with Atlas for the development of the Square. Defendant introduced evidence of Mrs. Evans' reluctance to enter into an agreement for sale or joint venture. Based on these two factors, the Government asks this Court to conclude that an agreement could not have been entered into at any time or under any circumstances.

■ We cannot engage in such speculation. The record does not show indisputably that an agreement between plaintiff and Mrs. Evans was impossible. It shows only that plaintiff had not entered into an agreement with Mrs. Evans during the sixteen months between purchasing its Square 406 properties and passage of the 1990 amendment. Moreover, it is questionable whether plaintiff needs to deal with Mrs. Evans at all. The Government's argument rests on the supposition that Square 406 cannot be developed without Mrs. Evans' consent (either through a buy-out or a joint venture) because she owns approximately 60% of the Square. The amount of the property owned by Mrs. Evans is in dispute. Plaintiff argues that Mrs. Evans owns only about 45% of the Square and that the remaining 15% of Square 406 is owned by Mr. Irwin Edlavitch. If Mr. Edlavitch owns 15% of Square 406, it is possible that plaintiff could gain control of the 50%

required for land assembly assistance without involving Mrs. Evans.

### B. Reasonableness of Investment-backed Expectations

■ Defendant's second argument focuses on the reasonableness of plaintiff's investment-backed expectations. The Government argues that plaintiff had actual or constructive knowledge at the time of purchase that full retention of the buildings could be required and that plaintiff assumed this risk. Generally, when an owner buys property with knowledge of restrictions upon the development of that property, he assumes the risk of any economic loss. The market has already discounted for the restraint. *Loveladies Harbor,* 28 F.3d at 1177. A party may not undertake a calculated business risk and then seek reimbursement from the Government when the party's gamble does not result in its favor. *Ciampitti v. United States,* 22 Cl.Ct. 310, 321 (1991). However, whether plaintiff knew or should have known of the possibility of full building retention remains at issue. The threshold question is whether this knowledge was a possibility.

■ The Plan and its supplements are strewn with inconsistencies and ambiguities. The 1974 Plan requires the "preservation of historic facades" in the block by block description of Square 406. In contrast, the Illustrative Site Plan in the same document recognizes the buildings in Square 406 as "designated landmark structures which are required to be retained." These words, in the absence of any limitation or qualification of retention, imply retention in full. However, the accompanying illustrations of the suggested development contradict the narrative. The illustrations show new buildings that overlap plaintiff's properties. The 1980 Guidelines require the "retention of the entire landmark structure." The 1986 Amendments to the 1974 Plan require "retention of the facades" and their incorporation into the development. The Historic Preservation Plan requires "historic landmarks to be restored in place."

Additionally, the record indicates that PADC's Executive Director, Mr. Brodie, and

PADC's Board of Directors were uninformed as to the required treatment for Square 406. The record shows that Mr. Brodie and the Board approved an amendment to the Plan to require retention in full of the Le Droit building and facade retention of plaintiff's other properties. If retention in full were already required by the Plan, then this amendment seems either superfluous or contradictory.

In light of these contradictions in the Plan and its supplements, it is unclear what restrictions and requirements existed prior to the 1990 amendment, how the amendment changed the requirements, and whether the amendment had any effect on the Plan. The Plan is clear and explicit in both the designation of the square as a minimum development parcel and the minimum requirements for land assembly assistance. However, the Plan is ambiguous regarding the treatment of historic structures. Plaintiff's rights at the time of purchase are unclear. We invite the parties to brief what restrictions and rights were bound to plaintiff's properties at the time of purchase.

## CONCLUSION

Defendant has not demonstrated the absence of any genuine issue of material fact regarding plaintiff's claim of an unjust taking under the Fifth Amendment. Accordingly, the Government's motion for summary judgment is DENIED. The parties will address the rights and restrictions that applied to plaintiff under the plan at the time it purchased the property, and the legal effect if those restrictions were unclear at the time. Briefs on these issues will be filed concurrently on or before March 1. Responses may be filed by March 15. Trial will be held in June 1995.